IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| RUSSELL ALLEN BEATTY, | CASE NO. 5:25-cv-778 |
| Plaintiff, | DISTRICT JUDGE PATRICIA A GAUGHAN |
| vs. | |
| COMMISSIONER OF SOCIAL SECURITY, | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| Defendant. | **REPORT & RECOMMENDATION** |

Plaintiff Russell Allen Beatty filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying disability insurance benefits and supplemental security income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

### Procedural history

In August 2022, Beatty filed an application for disability insurance benefits and supplemental security income, alleging a disability onset date of

March 12, 2022.[1] Tr. 14, 213, 220. In his application, Beatty claimed disability due to diabetes, depression, heart failure, and asthma. Tr. 277. The Social Security Administration denied Beatty's applications and his motion for reconsideration. Tr. 68–69, 86, 105. Beatty then requested a hearing before an Administrative Law Judge (ALJ). Tr. 129.

In January 2024, an ALJ held a hearing, during which Beatty and a vocational expert testified. Tr. 38–67. The next month, the ALJ issued a written decision finding that Beatty was not disabled. Tr. 14–32. The ALJ's decision became final on March 5, 2025, when the Social Security Appeals Council declined further review. Tr. 1–3; *see* 20 C.F.R. § 404.981.

Beatty filed this action on April 17, 2025. Doc. 1. He asserts the following assignment of error:

> The ALJ failed to account for the "total limiting effects" of Plaintiff's impairments pursuant to 20 C.F.R. §§ 404.1520c, 404.1529, and 404.1545(e), resulting in a decision that is not supported by substantial evidence.

Doc. 9, at 1.

**Evidence**

*Personal and vocational evidence*

Beatty was 39 years old on his alleged disability onset date. Tr. 30. He graduated from high school and earned about a year of college credits. Tr. 48.

---

[1]     "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

2

He last worked in 2022 as an order picker at an Amazon warehouse. Tr. 49.

*Relevant medical evidence*[2]

At cardiologist appointments in January, February, and March 2022, the provider noted that Beatty was fully oriented with normal behavior, thought content, and judgment. Tr. 422, 434, 577.

At an April 2022 pulmonology visit, Beatty denied psychiatric and behavioral symptoms. Tr. 366. The same month, Beatty saw his primary care provider, Paulo Borges, M.D. Tr. 464. Beatty reported symptoms consistent with mild depression. Tr. 464. He indicated depression stressors as being the caregiver for his ailing father and his mother's recent stage 4 cancer diagnosis. Tr. 464. Beatty reported normal concentration and denied sleep disturbance and suicidal ideation. Tr. 464. He said that his mood was improving and that Lexapro was helping, but not enough. Tr. 464. Dr. Borges described Beatty as alert, oriented, and pleasant, with age-appropriate behavior, adequate grooming, and normal eye contact. Tr. 467. Dr. Borges increased Beatty's daily Lexapro dosage from 10 mg to 20 mg. Tr. 467.

During a June 2022 telehealth visit with Dr. Borges, Beatty reported no depression symptoms. Tr. 460. He said that his mood was improving and that Lexapro was helping "significantly." Tr. 460. Dr. Borges described Beatty as

---

[2]     Beatty only challenges the ALJ's evaluation of his mental impairments. So in this report and recommendation I only recite evidence related to those impairments.

alert, oriented, and pleasant, with age-appropriate behavior, adequate grooming, normal eye contact, and appropriate speech. Tr. 462. Dr. Borges continued the Lexapro. Tr. 463.

In June 2022, Beatty saw a gastroenterologist. Tr. 408. At this visit, Beatty reported depression and difficulty sleeping. Tr. 409. His medical history included sleep apnea. Tr. 408. On exam, Beatty was fully oriented with normal insight and judgment and no evidence of depression, anxiety, or agitation. Tr. 410.

In September 2022, Beatty had a cardiology appointment. Tr. 440. The provider described Beatty as fully oriented with normal behavior, thought content, and judgment. Tr. 444. About a week later, Beatty saw Dr. Borges for a routine exam. Tr. 452, 454. Beatty denied depression, stressors, anxiety, mood swings, sleep problems, or memory loss. Tr. 455. Dr. Borges described Beatty as fully oriented, cooperative, pleasant, appropriate, and well-groomed with good hygiene and normal speech. Tr. 453. He decreased the Lexapro dosage to 10 mg daily. Tr. 454.

In January 2023, Beatty saw Taylor Groneck, Psy.D., for a virtual consultative psychological exam. Tr. 621. Beatty's chief complaint of mental impairments was that he was his father's caregiver, his mother had a recent stage 4 cancer diagnosis, and his doctor had put him on an anti-depressant. Tr. 621. Beatty denied then-current involvement in mental health treatment,

4

explaining that he had given up after three unsuccessful attempts to contact a mental health provider that his primary care provider had referred. Tr. 623.

Beatty denied a history of mental health hospitalizations and said that he was stressed due to his finances. Tr. 623. He reported that he was easily irritated and overwhelmed. Tr. 623. Beatty cited depression, sleep difficulties, no energy due to easily feeling winded, some problems with motivation, and loss of interest in previously enjoyable activities. Tr. 623. He said that he had never had any discipline problems at work, had never been fired from a job, and usually had no problems getting along with people at work. Tr. 623. He also said that he had "a short temper" and if people at work did "stupid stuff," Beatty would "snap pretty easy but other than that [he] g[o]t along with people well." Tr. 623. Beatty reported the following activities of daily living: watching television, doing "stuff" around the house, grocery shopping, performing all household chores, and occasionally visiting with family members. Tr. 623. He said that he takes breaks performing chores because of breathing problems. Tr. 623.

Dr. Groneck described Beatty as "a quietly cooperative man" who was casually dressed and adequately groomed. Tr. 624. His thoughts were goal oriented, organized, and relevant to the questions asked of him, and his responses suggested that he was of average intelligence. Tr. 624. Beatty appeared depressed and mildly irritable with a blunted affect. Tr. 624. He maintained good eye contact, but had non-expressive facial expressions, low

5

energy, and markedly slowed psychomotor speed. Tr. 623. Beatty was fully oriented with adequate short-term, working, recent, and remote memory. Tr. 624. Dr. Groneck described Beatty's mathematical abilities as "adequate as he was able to complete basic addition, subtraction, multiplication, and division." Tr. 624. Beatty's "concentration skills were poor" and he "appeared to be distracted during the conversation," asking for questions to be repeated. Tr. 624. Beatty had adequate general reasoning abilities, insight, and judgment Tr. 624.

Dr. Groneck diagnosed Beatty with "major depressive disorder, recurrent, severe." Tr. 625. She concluded that "Beatty is not expected to show problems remembering or carrying out simple one and two step job instructions." Tr. 626. He "may be easily distracted by depressive symptoms" and "will likely appear withdrawn to others." Tr. 626. Beatty "may display poor frustration tolerance in response to novel and demanding tasks," and "exposure to workplace pressures may also exacerbate his experience of fatigue." Tr. 626.

In March 2023, Beatty transferred care to a new primary care provider, Ahmad Ibrahim, M.D. Tr. 631. Beatty reported that for his anxiety he had been on Lexapro for about a year "at 20 mg but he had side effects." Tr. 631. Beatty told Dr. Ibrahim that he felt overwhelmed, but that he wanted to address his physical complaints before titrating his then-current, 10 mg Lexapro dosage. Tr. 631–32. On exam, Beatty's mood was normal. Tr. 633.

6

During an April 2023 cardiology visit, Beatty was fully oriented with an appropriate mood and affect. Tr. 875–76. At a May 2023 appointment with Dr. Ibrahim, Beatty was alert with a normal mood. Tr. 864, 867.

In September 2023, Beatty visited the emergency room for physical complaints. Tr. 833. He denied agitation and behavioral problems and had a normal mood and behavior. Tr. 834–35. At a follow-up visit with Dr. Ibrahim, Beatty denied agitation and behavioral problems. Tr. 815, 817. On exam, he had a normal mood and normal behavior. Tr. 818.

At a pulmonology appointment in October 2023, Beatty denied sleep disturbance, mood disorder, and recent psychosocial stressors. Tr. 806. In November 2023, Beatty followed up with Dr. Ibrahim. Tr. 779. Beatty reported numerous physical-related complaints and anxiety. Tr. 782–83. Dr. Ibrahim described Beatty as alert with a normal mood. Tr. 784. He assessed Beatty with anxiety and advised him to consider counseling or medication in the future if no organic cause were found for his shortness of breath. Tr. 785.

*State agency opinions.*[3]

In February 2023, Clare McGinness, Ph.D., reviewed Beatty's record and found that Beatty had no more than mild limitations in four areas of mental functioning. Tr. 73–74.

In June 2023, Mary Hill, Ph.D., reviewed Beatty's record and opined that Beatty had mild and moderate limitations in four areas of functioning. Tr. 90, 93. Regarding Beatty's mental residual functional capacity (RFC),[4] Dr. Hill found that Beatty could "complete a variety of tasks with no requirement for a rapid pace" and "work in a setting with occasional changes." Tr. 93.

*Hearing testimony*

Beatty, who was represented by counsel, testified at the telephonic administrative hearing held in January 2024. Beatty testified that he easily becomes irritable and is "always irritable." Tr. 57. He lacks motivation to do things on his own and does better when he does things with others. Tr. 57. He

---

[3]     When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[4]     An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

sleeps a lot and takes Lexapro for depression. Tr. 57. Beatty takes online college courses but struggles to focus and remember the material. Tr. 58. For example, he needs to revisit the material because he forgets things or hasn't comprehended what he read. Tr. 58.

The ALJ discussed with the vocational expert Beatty's past work as a stock clerk and order picker. Tr. 62–63. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Beatty could perform Beatty's past work or any other work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 63. The vocational expert answered that such an individual could not perform Beatty's past work, but could perform the following jobs: office helper, collator operator, and order caller. Tr. 64. The ALJ asked the vocational expert to describe the tolerable off-task time rate. Tr. 65. The vocational expert answered that most employers will tolerate up to nine percent of off-task time. Tr. 65. She confirmed that off-task time included unscheduled breaks. Tr. 65.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

> 1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2027. (4D).

> 2. The claimant has not engaged in substantial gainful activity since March 12, 2022, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

9

3. The claimant has the following severe impairments: Chronic Systolic Congestive Heart Failure ("CHF"), Cardiomyopathy, Asthma, Chronic Obstructive Pulmonary Disease ("COPD"), Restrictive Airway Disease, Diabetes Mellitus Type I with Hyperglycemia and Neuropathy, Varicose Veins of the Bilateral Lower Extremities, Depressive Disorder, and Anxiety. (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can never climb ladders, ropes, or scaffolds, but can occasionally climb ramps and stairs. The claimant can frequently balance, stoop, kneel, crouch, and crawl. The claimant can tolerate occasional exposure to extreme cold, extreme heat, humidity, and pulmonary irritants such as fumes, odors, dusts, gases, and poor ventilation. The claimant must avoid all exposure to hazards such as unprotected heights, dangerous moving mechanical parts, and commercial driving. The claimant can perform simple, routine, and repetitive tasks, but cannot perform tasks which require a high production rate pace (for example, such as assembly line work), and can respond appropriately to occasional change in a routine work setting.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was … 39 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

10

8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from March 12, 2022, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 16–32.

### Standard for Disability

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1.      Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2.      Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3.      Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4.      What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5.      Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

### Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* at 103. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v.*

*Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

Beatty argues that the ALJ "failed to account for the 'total limiting effects' of [Beatty's] impairments pursuant to 20 C.F.R. §§ 404.1520c, 404.1529, and 404.1545(e), resulting in a decision that is not supported by substantial evidence." Doc. 9, at 1. Essentially, Beatty challenges the ALJ's evaluation of the opinion evidence, Beatty's reports of symptoms, and whether the ALJ's RFC was supported by substantial evidence. *Id.* at 8–13.

1. *The ALJ did not err when evaluating Dr. Hill's opinion*

Beatty challenges the ALJ's evaluation of state agency reviewer Dr. Hill's opinion. Dr. Hill assessed Beatty's RFC and opined that Beatty could "complete a variety of tasks with no requirement for a rapid pace" and "work in a setting with occasional changes." Tr. 102–03. The ALJ discussed Dr. Hill's opinion as follows:

> the State agency consultant opined that the claimant could complete a variety of tasks with no requirement for a rapid pace. The claimant could work in a setting with occasional changes. (6A; 7A). I find this opinion to be persuasive as it is consistent with the overall record.

Tr. 28 (the ALJ's fact-based explanation omitted). And the ALJ's RFC assessment limited Beatty to the following:

> simple, routine, and repetitive tasks, but cannot perform tasks which require a high production rate pace (for example, such as assembly line work), and

14

> can respond appropriately to occasional change in a
> routine work setting.

Tr. 22. In short, the ALJ evaluated Dr. Hill's opinion; found it persuasive; and

adopted Dr. Hill's limitations in the RFC assessment.

Beatty argues that Dr. Hill made other findings that the ALJ failed to

discuss. Doc. 9, at 8–9 (citing Tr. 102). Beatty highlights on the Agency's form

the "moderate" limitations that Dr. Hill ascribed to Beatty's abilities. *Id*. (citing

the ability to "maintain attention and concentration for extended periods,"

"perform activities within a schedule, maintain regular attendance, and be

punctual within customary tolerances," and "complete a normal workday and

workweek without interruptions from psychologically based symptoms and to

perform at a consistent pace without an unreasonable number and length of

rest periods"), Tr. 102. Beatty claims that these all amount to an "off-task"

limitation that Dr. Hill assessed and which the ALJ erroneously failed to

include in the RFC assessment or explain why he omitted it. Doc. 9, at 9–10.

What Beatty is referring to is a list of questions that the Agency's form

asks doctors to answer to aid the doctors in drafting the narrative portion of

the claimant's RFC limitations. *See, e.g.,* Tr. 102 (the Agency's "MRFC1" form

asking the doctor to rate eight questions regarding "Sustained Concentration

and Persistence Limitation"). But this question-and-rating portion of the form

is not Dr. Hill's RFC assessment. Dr. Hill's RFC assessment is found later, in

the narrative portion of the form. Indeed, the form itself explains this:

> The questions below help determine the individual's ability to perform sustained work activities. *However, the actual mental residual functional capacity assessment is recorded in the narrative discussion(s),* which describes how the evidence supports each conclusion. *This discussion(s) is documented in the explanatory text boxes following each category of limitation* (i.e., understanding and memory, sustained concentration and persistence, social interaction and adaptation).

Tr. 102 (emphasis added). True to form, following the list of questions Beatty cites, Dr. Hill is asked to "[e]xplain in narrative form" Beatty's "sustained concentration and persistence capacities and/or limitations." *Id*. And Dr. Hill wrote that Beatty is "[a]ble to complete a variety of tasks with no requirement for a rapid pace." *Id*. This is Dr. Hill's opinion on Beatty's concentration, persistence, and pace abilities, and this is what the ALJ evaluated. Tr. 28, 102.

Beatty has not cited any legal authority to support his interpretation of the Agency's forms and what the ALJ must discuss. His argument that Dr. Hill's "moderately limited" ratings constitute an "opinion" subject to the discussion requirement is not persuasive. Unlike the narrative portion of the forms, the ratings don't describe what Beatty can still do despite his impairment. *See* 20 C.F.R. § 404.1513(a)(2) (defining a "medical opinion" as "a statement from a medical source about what [claimants] can still do despite [their] impairment(s)"); 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations."). Beatty argues that the regulations require the ALJ to "consider 'all relevant evidence' under the RFC analysis," Doc. 9, at 10 (citing 20 C.F.R. § 404.1545(a)(1)), but he has

16

not shown that the ALJ failed to "consider" all of Dr. Hill's notations. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party") (quoting *Loral Defense Systems–Akron v. NLRB*, 200 F.3d 436, 453 (6th Cir. 1999)).

In his reply brief, Beatty makes a new argument. He contends that *Dr. Hill* erred because her "narrative RFC does not encapsulate" the *moderately limited* ratings that she assessed in the rating portion of the form. Doc. 12, at 3. And the ALJ in turn erred, Beatty says, because he "provided no analysis regarding whether Dr. Hill's narrative RFC assessment 'adequately encapsulate[d] and translate[d]' the moderate limitations that would inevitably result in Plaintiff being off task at least some portion of the workday." *Id.* (citing *Pavlicek v. Saul*, 994 F.3d 777, 783 (7th Cir. 2021)). This is a different argument than the one that Beatty made in his opening brief. He has therefore forfeited this argument. *See Island Creek Coal Co. v. Wilkerson*, 910 F.3d 254, 256 (6th Cir. 2018) ("Time, time, and time again, we have reminded litigants that we will treat an 'argument' as 'forfeited when it was not raised in the opening brief.'") (citation omitted)).

Even if the Court were to consider Beatty's forfeited argument, it would fail. First, Beatty argues that the ALJ had a duty to "provide … analysis" regarding whether Dr. Hill's ratings matched her narrative RFC limitations, Doc. 12, at 3, but the Seventh Circuit case he cites in support, which is not

binding on this Court, did not say that the ALJ must discuss this issue. *See Pavlicek*, 994 F.3d at 783 ("The ALJ must *consider* whether the consultants' narrative RFC assessments 'adequately encapsulate[d] and translate[d]" the checklist.") (emphasis added). Again, Beatty has confused the ALJ's duty to *consider* evidence with the ALJ's duty to *discuss* evidence. And he has not shown that the ALJ failed to consider all of Dr. Hill's notations.

Second, Beatty relies on *Varga v. Colvin*, 794 F.3d 809 (7th Cir. 2015), which is also not binding on this Court. Doc. 9, at 3. In *Varga*, the Agency lost the state agency reviewing doctor's narrative portion of the form—it only had the doctor's indication of "moderate" limitations in the ratings portion of the form. *Id*. at 812. The court held that "where, as here, no narrative translation exists—because of error on the part of the doctor or the agency—an ALJ's hypothetical question to the [vocational expert] must take into account any moderate difficulties in mental functioning found [in the ratings section of the Agency's form]." 794 F.3d at 816. Beatty quotes this passage, Doc. 12, at 3, but ignores the fact that in this case Dr. Hill's narrative portion of the form has not been lost. It exists, Tr. 102, and the ALJ relied on it, Tr. 28. *Varga* is not on point.

Finally, Beatty hasn't shown that *moderate* limitations in the ability to "maintain attention and concentration for extended periods"; "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances"; and "complete a normal workday and workweek

18

without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," *see* Tr. 102, is not "adequately encapsulate[d] and translate[d]" by Dr. Hill's finding that Beatty can "complete a variety of tasks with no requirement for a rapid pace." *See Weirauch v. Comm'r of Soc. Sec.*, No. 20-11511, 2021 WL 4497865, at *15 (E.D. Mich. Mar. 23, 2021) ("a limitation of non-production-rate work is a common and adequate limitation for those persons who suffer from moderate difficulties in concentration, persistence, or pace."), *report and recommendation adopted*, 2021 WL 4480473 (E.D. Mich. Sept. 30, 2021); *see also Pavlicek*, 994 F.3d at 783 (finding that "the ALJ reasonably relied on the narrative RFC because it was in fact consistent with the 'moderate' checklist ratings" since "a 'moderate' limitation in performing at a consistent pace seems consistent with the ability to perform simple, repetitive tasks at a consistent pace.").

For all of the reasons explained above, Beatty has not shown that the ALJ erred when he evaluated Dr. Hill's opinion.

### 2. *The ALJ did not err when evaluating Dr. Groneck's opinion*

Beatty argues that the ALJ "did not address whether []he accepted or rejected Dr. Groneck's pacing limitation." Doc. 9, at 10. He also alleges that the ALJ failed to "explain why he explicitly adopted Dr. Groneck's opinion, citing evidence of social and stress tolerance problems, but failed to include social or stress tolerance limitations in the RFC." *Id*.

The ALJ discussed and evaluated Dr. Groneck's opinion as follows:

> The psychological consultive examiner opined that the claimant was not expected to show problems remembering or carrying out simple one and two step job instructions. The claimant might be easily distracted by his mental health symptoms. The claimant would likely appear withdrawn to others. The claimant might display poor frustration tolerance and exposure to workplace pressures might exacerbate the claimant's fatigue. (10F/7). I find this opinion to be persuasive to the degree that it suggests that the claimant has impairments to his concentration and stress tolerance. It was supported by the claimant's need for redirection during the examination and the claimant's reports of poor stress tolerance. It was also consistent with the claimant's statements in his function report that he tolerated stress poorly and had limited concentration unless he was interested in a particular subject. However, the limitations discussed are vague which limits their usefulness as a tool to establish specific work limitations. (Testimony; 2E; 10F).

Tr. 27.

Dr. Groneck did not assess a "pacing limitation"—all Dr. Groneck said was that Beatty "may be easily distracted by depressive symptoms." Tr. 626. The ALJ considered this opinion and explained to what extent he found it to be both persuasive and unpersuasive. Tr. 27. And the ALJ's RFC included a pace restriction. Tr. 22. So the ALJ "address[ed] whether [h]e accepted or rejected Dr. Groneck's pacing limitation," Doc. 9, at 10, to the extent it could be said that Dr. Groneck assessed one.

Beatty's assertion that the ALJ "failed to include … stress tolerance limitations in the RFC," Doc. 9, at 10, fails because the ALJ included a stress-

20

tolerance limitation in his RFC assessment, *see* Tr. 22 (the ALJ's RFC assessment limiting Beatty to occasional changes in a routine work setting).

Beatty argues that the ALJ "explicitly adopted Dr. Groneck's opinion, citing evidence of social … problems, but failed to include social … limitations in the RFC." Doc. 9, at 10. But the ALJ didn't adopt Dr. Groneck's social-limitations comment; he only adopted Dr. Groneck's opinion regarding pace and stress tolerance. Tr. 22, 27. So the ALJ wasn't required to include social limitations in his RFC assessment. *See Lester v. Soc. Sec. Admin.*, 596 F. App'x 387, 389 (6th Cir. 2015) ("The ALJ is required to incorporate [in the RFC] only those limitations that he or she accepted as credible."). Moreover, Dr. Groneck's opinion that Beatty "would likely appear withdrawn to others," Tr. 626, is vague, as the ALJ found, Tr. 27. Indeed, it "can be discounted as not describing any functional limitations at all." *See Woodard v. Comm'r of Soc. Sec. Admin.*, No. 5:22-cv-1728, 2023 WL 6005004, at *10 (N.D. Ohio July 27, 2023) ("Opinions that express functional limitations in vague terms can be discounted as not describing any functional limitations at all.") (citing *Quisenberry v. Comm'r of Soc. Sec.*, 757 F. App'x 422, 431 (6th Cir. 2018)), *report and recommendation adopted*, 2023 WL 5842016 (N.D. Ohio Sept. 11, 2023); *Nolcox v. Berryhill*, No. 1:17-cv-02655, 2019 WL 1331582, at *10 (N.D. Ohio Mar. 25, 2019) ("To treat the possible limitations floated by [doctors] as an affirmative finding … would improperly alter the contents of the medical source's opinion.").

21

Beatty has not shown that the ALJ erred when evaluating Dr. Groneck's opinion.

### 3. *The ALJ did not err when evaluating Beatty's reports of limitations*

Beatty argues that the ALJ failed to properly evaluate Beatty's "self-described limitations." Doc. 9, at 11. This is so, Beatty contends, because of the errors that the ALJ made when evaluating the opinion evidence. *Id.*; Doc. 12, at 5. But the ALJ did not err when evaluating the opinion evidence, so this argument fails.

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ considers medical evidence, the claimant's statements, other information provided by medical sources, and any other relevant evidence in the record. *See* Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *4 (Oct. 25, 2017); 20 C.F.R. § 404.1529. Other relevant evidence includes: daily activities; the location, duration, frequency, and intensity of pain or symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication; treatment, other than medication, to relieve pain; any measures used to relieve pain; and "[o]ther factors concerning … functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. § 404.1529(c). "The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence." *Hatcher v. Berryhill*, No. 1:18-cv-1123, 2019 WL 1382288, at *15 (N.D. Ohio Mar. 27,

2019) (citing *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005)).

Beatty objects to the ALJ's finding that his mental health treatment was "conservative, consisting of medication, and was provided by his primary care provider, not a mental healthcare specialist." Doc. 9, at 11 (citing Tr. 26). Beatty complains that the ALJ "did not define nonconservative mental health care" and that he "is unaware of any agency authority requiring a claimant to demonstrate whatever that might mean (e.g., electroconvulsive therapy or psychiatric institutionalization), to prevail in a Social Security disability claim." *Id*. at 11–12. But the ALJ explained why Beatty's care was conservative—it consisted of medication provided by his primary-care doctor rather than a specialist. Tr. 26. This was accurate and appropriate. *See Napier v. Comm'r of Soc. Sec.*, 127 F.4th 1000, 1005 (6th Cir. 2025) (upholding the ALJ's non-severe finding at step two because, in part, the ALJ "emphasized that Napier's treatment history with respect to her anxiety and depression was quite limited [since] … she had been prescribed antidepressants by a medical (not mental) healthcare provider"); *Monateri v. Comm'r of Soc. Sec.*, 436 F. App'x 434, 445 (6th Cir. 2011) (affirming the ALJ's adverse credibility finding, noting that the claimant's mental impairments did not require "acute inpatient or outpatient emergency care and treatment"); *Burley v. Comm'r of Soc. Sec.*, No. 4:23-cv-218, 2023 WL 9604195, at *16 (N.D. Ohio Dec. 20, 2023) (the ALJ's characterization of the claimant's treatment as conservative was accurate

23

since it "required no associated emergent, inpatient, or day program treatment related to her mental health"), *report and recommendation adopted*, 2024 WL 1297554 (N.D. Ohio Mar. 27, 2024). Indeed, even Beatty testified at the administrative hearing that he's "not being treated for depression or anxiety" since he takes medication "that's just prescribed by my primary care doctor." Tr. 56. The type of treatment is a proper basis for discounting Beatty's reports of limitations. *See* 20 C.F.R. § 404.1529(c)(3)(iv),(v) (the ALJ considers treatment, including medication, that the claimant receives).

Beatty concedes that his treatment was conservative, because he then contends that he "failed conservative treatment." Doc. 9, at 12. In support of this assertion, Beatty cites a treatment note from March 2023 in which he told his new primary care doctor that he had "side effects" when taking 20 mg of Lexapro. *Id.* (citing Tr. 631). This does not show that Beatty failed conservative treatment. In fact, at this March 2023 visit, Beatty told Dr. Ibrahim that he didn't want to address his mental-health issues by trying a medication adjustment. Tr. 631.

Beatty points out that he testified that he was "always irritable" and that he reported to Dr. Groneck this and other complaints.[5] Doc. 9, at 12. But

---

[5]      Twice Beatty in his brief asserts that he testified that he "spends most of his time alone," Doc. 9, at 4, 12 (citing Tr. 58–59), and argues that the ALJ "failed to reflect these [and other] findings," *id.* at 13. Beatty testified at the hearing that his lives with his spouse and father, Tr. 46, and the pages Beatty cites show Beatty discussing at the hearing picking up his father from the hospital, taking online college classes, checking Facebook, and getting lunch

the ALJ considered Beatty's reports of irritability and other complaints that

he made to Dr. Groneck. Tr. 21, 27. The ALJ explained:

> As for the claimant's mental health, the claimant stated in his function report that his concentration was limited, and he could become distracted while engaging in activities that did not interest him. He testified that he experienced limited motivation and energy. The psychological consultative examiner observed that the claimant's concentration was poor, and that he required instructions to be repeated. However, the claimant retained sufficient concentration to complete basic addition, subtraction, multiplication, and division problems. The claimant's treatment providers did not note that the claimant had observably poor concentration during treatment. Furthermore, the claimant engaged in activities that demonstrated that his attention and concentration were more intact than alleged. The claimant watched videos and used Facebook for entertainment. The claimant was able to manage his own funds. The claimant was able to drive. The claimant was able to take six credit hours of college courses. Finally, the claimant did not require significant redirection during the hearing. (Testimony; 2E; 3F; 4F: 5F; 16F).
>
> Nevertheless, the claimant's treatment providers observed that the claimant's judgment and insight were adequate. The claimant engaged in normal behavior. During the consultative examination, the claimant displayed adequate judgment and insight. The claimant's thought content was unremarkable. Furthermore, the claimant was able to manage daily tasks such preparing simple meals, cleaning, and yardwork. The claimant was able to drive and manage his own funds. Finally, the claimant was able to help care for his ill father. (Testimony; 2E; 3F; 4F: 5F; 16F).

---

with his spouse. Tr. 58–59. This doesn't support Beatty's assertion that he testified that he "spends most of his time alone."

Tr. 29; *see* 20 C.F.R. § 404.1529(c)(3)(i) (the ALJ considers the claimant's daily activities). Elsewhere in his decision, the ALJ summarized the evidence in the record, including Beatty's improvement with medication, unremarkable objective exam findings throughout the period, and the consultative examiner's report. Tr. 26–27 (*see* 20 C.F.R. § 404.1529(c)(2),(3) (the ALJ considers objective evidence and "other evidence," including medical source statements)).

Beatty highlights items in Dr. Groneck's report, Doc. 9 at 12–13, many of which the ALJ recited, Tr. 27 (the ALJ noting Beatty's reports that he was irritable, depressed, overwhelmed, and lacked energy and motivation, and listing Dr. Groneck's objective exam and cognitive findings). "[T]he law does not require the ALJ to discuss every piece of evidence that is supportive or inconsistent with the RFC. And … the ALJ cannot be expected to discuss every piece of evidence that Plaintiff believes is inconsistent with the RFC." *Byler v. Kijakazi*, No. 5:20-cv-1822, 2022 WL 980099, at *9 (N.D. Ohio Jan. 21, 2022), *report and recommendation adopted*, 2022 WL 971384 (N.D. Ohio Mar. 31, 2022). Beatty disagrees with the ALJ's conclusion, but merely citing evidence and disagreeing with the ALJ's conclusion does not show that the ALJ's decision lacks substantial evidence. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997) ("The decision of an ALJ is not subject to reversal, even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ.").

Beatty has not shown that the ALJ erred when he evaluated Beatty's reports of symptoms and limitations, or that the ALJ's decision is unsupported by substantial evidence.

**Conclusion**

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: November 25, 2025

 /s/ James E. Grimes Jr.
James E. Grimes Jr.
U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).